FILED & JUDGMENT ENTERED
Steven T. Salata

January 2 2024

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **BK Racing, LLC,** | ) | Chapter 11 |
| | ) | Case No. 18-30241 |
| Debtor. | ) | |
| | ) | |
| **Matthew W. Smith the sole manager** | ) | |
| **For BK RACING, LLC,** | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **Nancy J. O'Haro,** | ) | Adversary Proceeding No: 20-03007 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER GRANTING PLAINTIFF'S RENEWED MOTION FOR SANCTIONS, IMPOSING SANCTIONS, AND ENTERING DEFAULT JUDGMENT**

**THIS MATTER** is before this Court upon: (i) the *Order on Plaintiff's Renewed Motions to Compel* [Doc. 59], (ii) Plaintiff's *Renewed Motion for Sanctions for Defendant's Failure to Comply with Discovery Orders* ("Plaintiff's Renewed Motion for Sanctions") [Doc. 81], and (iii) *Defendant's Response to Renewed Motion for Sanctions for Defendant's Failure to Comply with Discovery Orders* [Doc. 82]. A hearing was first held on this matter on June 21, 2023, and was

1

completed on August 30, 2023 ("Hearing").  Andrew T. Houston, Esq. and Caleb Brown, Esq. appeared on behalf of Plaintiff Matthew W. Smith, the Sole Manager for BK Racing under its Confirmed Plan, and the former Chapter 11 Trustee of the Debtor's bankruptcy estate ("Smith").  John C. Woodman, Esq. and David R. DiMatteo, Esq. appeared on behalf of Defendant Nancy J. O'Haro ("O'Haro").

For the reasons stated herein, Plaintiff's Renewed Motion for Sanctions is **GRANTED**.  The Defendant shall be taxed with Smith's costs and fees associated with this motion.  Given the Defendant's repeated failures to make discovery in this action, including the egregious conduct displayed at her most recent deposition, Defendant's Answer will be **STRICKEN,** the allegations in the Complaint are deemed admitted, and **DEFAULT JUDGMENT WILL BE ENTERED** against her.

## PROCEDURAL POSTURE

Smith filed this avoidance action against O'Haro, on February 10, 2020.  This proceeding is one of three related adversary proceedings filed in this bankruptcy case.  It and the others, Smith v. DiSeveria, Adv. No. 20-03057, and Smith v. Devine, Adv. No. 20-3014 (the "Related Cases"), involve prepetition transfers made by BK Racing to its insiders and to persons closely allied with those insiders.  The three sets of defendants in the Related Cases have been represented by the same law firm.  Although only a party to one of these actions, BK Racing's principal, Ron Devine, has been integrally involved in the defense of all three.  It is no coincidence that each adversary proceeding has been plagued by unsubstantiated, "narrative" defenses and by repeated failures of the defendants to make discovery.

In the current adversary proceeding, Smith filed his first Motion to Compel ("First Motion") against O'Haro on July 9, 2021. [ Doc. 22].  After a hearing, the First Motion was granted

2

by order dated August 6, 2021 ("First Discovery Order"). [Doc. 28]. O'Haro was ordered to rework her discovery responses.

Further failures by O'Haro to make discovery caused Smith to file a second Motion to Compel ("Second Motion") on August 17, 2021, relating to his Second Discovery Requests. [Doc. 29]. The Second Motion was consensually resolved and led to entry of an order dated September 17, 2021 ("Second Discovery Order"). The Second Discovery Order required O'Haro to redo her responses to Smith's Second Discovery Requests and to comply with other specific requirements. [Doc. 28].

On December 21, 2021, Smith filed a third motion to compel entitled "Plaintiff's Report and Brief Regarding Defendant's Failure to Comply With: (A) Discovery Requests, and (B) Court Orders" ("Plaintiff's Report"). [Doc. 45]. The Plaintiff's Report argued that O'Haro failed to comply with both the First Discovery Order and the Second Discovery Order. Id. Additionally, the Plaintiff's Report asserted that O'Haro failed to make discovery due to her repeated invocation of the Fifth Amendment during a November 9, 2021 deposition ("First Deposition"). Due to the repeated discovery failures outlined in Plaintiff's Report, Smith then asked the Court: (1) to tax O'Haro with his costs and attorneys' fees, and (2) to enter default judgment against O'Haro.

After a hearing, this Court entered an Order dated May 10, 2022 on Plaintiff's Report and renewed motions to compel (the "May 10 Order"). [Doc. 59]. The May 10 Order summarized the multiple various discovery failures by the Defendant up to that point. These included O'Haro's failure to produce documents and her failure to disclose bank accounts. Also noted was O'Haro's constant invocation of the Fifth Amendment during her First Deposition.[1] The May 10 Order

---

[1] As described below, this Court did not question O'Haro's assertion of the Fifth Amendment privilege at her first deposition. Nor did we draw an adverse inference from her invocation of the privilege. At that point, a federal criminal inquiry was underway that had BK Racing as its focus. As personal assistant to Ron Devine, O'Haro had been involved in BK Racing's management. However, by the time the Plaintiff's Report was heard, O'Haro had

3

concluded that O'Haro had failed, on several occasions, to make discovery such that the imposition of sanctions was appropriate. Under the Fourth Circuit's four-part test from Mut. Fed. Sav. & Loan Assn, this Court then concluded that O'Haro had acted in bad faith; had caused significant prejudice to the Plaintiff; and that there was a need for deterrence of this sort of noncompliance. Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs. Inc., 872 F.2d 88, 92 (4th Cir. 1989). However, because less drastic sanctions (the fourth element) had not been exhausted, I declined to enter default judgment. Once again O'Haro was required to amend her discovery responses and to provide other information; she was taxed with the Plaintiff's costs and attorneys' fees; and significantly she was ordered to sit for a second deposition.

However, even this discovery order failed to rectify the problems. On October 14, 2022, Plaintiff again renewed his motion for sanctions, this time based upon O'Haro's testimony during the second deposition taken on September 28, 2022. ("Second Deposition"). This set off another flurry of motions and pleadings.

Because of the relatively small sums in controversy (and perhaps due to exhaustion from the endless discovery litigation), the parties agreed to a joint motion hearing and trial. They stipulated to certain basic facts and agreed to take further evidence at hearing. They agreed that the Court would first hear the current motion, the Plaintiff's Renewed Motion for Sanctions. If the case was not resolved based upon the motion, then a trial decision could be rendered. It was agreed that the evidence presented at the joint hearing would be used for both motion and trial. Order Approving Parties Stipulations for Trial of This Action. [Doc 102]. This hybrid hearing/trial was conducted on both June 21 2023 and then later continued on August 30, 2023.

---

been released from her subpoena and was, by her own statement, available to testify. Thus, in the May 10 Order, and against a backdrop of failures to make written discovery, O'Haro was ordered to sit for a second deposition. She was then warned that her failure to answer questions at this Second Deposition could have ramifications in this action.

4

**Holding:** Since the entry of the May 10, 2022 Order and regarding the Second Deposition, O'Haro has again failed to make discovery. She has also committed discovery misconduct in that during this video deposition her testimony was coached by an undisclosed, "off camera" person. And finally, during a break, O'Haro received instruction from an undisclosed person, and then offered it as her own testimony. Given all, O'Haro has prevented the Plaintiff from acquiring the discovery necessary for him to receive a fair trial. With lesser sanctions exhausted, this Court concludes that the Renewed Motion for Sanctions should be **GRANTED**; the Defendant's Answer should be **STRICKEN**; and **DEFAULT JUDGMENT** should be entered against O'Haro. Given this, a trial decision need not be entered.

## BACKGROUND

Much of the procedural background pertinent to the current dispute is detailed in the May 10 Order. [Doc. 59]. A broader factual and procedural background demonstrating the eerily similar litigation course of the three Related Cases is found in our order of August 23, 2022 in *Smith v. Devine*, Adv. No. 20-3014, Doc. No. 81. In short, BK Racing, LLC ("BK Racing" or "Debtor") is a North Carolina limited liability company owned indirectly, through Virginia Racers Group, LLC, by Ronald C. Devine ("Ron Devine") and his wife, Brenda S. Devine (collectively, the "Devines"). Ron Devine operated BK Racing on a day-to-day basis. Although employed by another company, O'Haro was Ron Devine's long time personal assistant.

BK Racing owned and operated a NASCAR Cup Series race team from 2012 through early 2018. It lost an inordinate amount of money during those years, perhaps as much as $48 million. To prevent a secured creditor from having a receiver appointed for the company, on February 15, 2018, BK Racing filed a "bare bones" Chapter 11 petition in this judicial district. At the time, BK Racing had tens of millions of dollars of tax liens and outstanding judgments against it. It also had

transferred over $1.4 million of its assets to insiders in the year preceding bankruptcy, much of that to Ron Devine and his other companies. Despite the best interests of BK Racing's bankruptcy attorney to obtain this information from both Ron Devine and O'Haro, these transfers were not disclosed in the company's bankruptcy schedules. In fact, Ron Devine resisted providing such information, and ultimately, BK Racing didn't even file its Schedules.

After six weeks of the Debtor ignoring this and other legal responsibilities as a debtor in possession, Smith was appointed Chapter 11 trustee. He was charged with managing the Debtor's operations and affairs. Smith operated BK Racing for most of the NASCAR season until, on August 24, 2018, the race team assets were sold. Order Approving Sale of Race Team Assets [Doc. 191]. On January 28, 2020, a Chapter 11 Plan of liquidation was confirmed. Smith then became the "Sole Manager for the Reorganized Debtor," a position legally equivalent to a bankruptcy trustee. Under the Plan, Smith was charged with investigating and bringing causes of action on behalf of the Debtor's creditors.

Smith filed several adversary proceedings against the individuals who owned or operated BK Racing. These included an action against the Devines and their companies, another against an officer/indirect minority owner, Michael DiSeveria, and this one filed against O'Haro.

This adversary proceeding was filed on February 10, 2020. On its face, it appears to be a simple Chapter 5 "claw back" suit. The Complaint asserts that BK Racing made fraudulent or preferential and unauthorized post-petition transfers to O'Haro totaling at least $107,015.00 between March 24, 2017, and March 19, 2018, while the Debtor was insolvent, undercapitalized and/or not paying its debts (the "Transfers"). [Doc. 1]. The Complaint seeks to avoid and recover the Transfers pursuant to 11 U.S.C. §§ 542, 544, 547–549 and 550, as well as N.C. Gen. State. § 39–23.1 et seq. Id.

6

O'Haro is not just Ron Devine's former personal assistant but is a self-described close friend.  At the time of the Transfers, O'Haro was an employee of A&R Foods, Inc. ("A&R"), one of Ron Devine's numerous corporate entities.  It has been learned since bankruptcy that O'Haro is also the successor trustee of the BRBRC Irrevocable Trust, a self-settled spendthrift trust that Devine established in 2018 to support himself and his family in the face of litigation and tax liens.[2]  While not a BK Racing employee, O'Haro was personally involved in the management of the Debtor.  She was also personally involved in the preparation of the bankruptcy petition and was one of the people to whom BK Racing's bankruptcy counsel directed his requests for financial information for inclusion in the Schedules (that BK Racing ultimately never filed).  Finally, O'Haro appeared on many of the emails and correspondence between Devine and third parties concerning BK Racing and others.

Although a former clerical worker who was paid a modest salary, O'Haro maintains that she was a lender to BK Racing and several of Ron Devine's other companies.  Through his investigation, Smith discovered substantial sums money deposited by BK Racing into O'Haro's bank accounts which were then retransferred to Ron Devine's other entities.  Also, monies from other Ron Devine companies were deposited into, and flowed through, O'Haro's bank accounts.  Of note, in 2018, after this bankruptcy, O'Haro appeared in the Bankruptcy Court for the Eastern District of Virginia claiming to be a secured creditor in the Chapter 11 bankruptcy case[3] of Springfield Land Development, LLC ("Springfield"). Springfield was another one of Ron Devine's companies.  In the *Springfield* case, O'Haro claimed to hold a second deed of trust in the amount of $560,000 based on undocumented loans she claims to have made to Springfield.

---

[2] The existence of this trust was concealed by Ron Devine but was independently discovered by Smith.
[3] Eastern District of Virginia Case No. 18-13583.

7

One of the questions in the present action is whether the nine transfers (the "Transfers") made to O'Haro by the Debtor were repayments of loans or something else more nefarious. O'Haro contends the Transfers are loan repayments. Admittedly, the Debtor's checks to O'Haro have the word "loan" handwritten in the memo section. However, according to O'Haro, no other documents, ledgers, communications, or other extrinsic evidence exist that support her contention that these were loans.[4]

Meanwhile, Smith contends that the lack of supporting extrinsic evidence and other attendant circumstances suggests the Transfers were not loan repayments. In the year prior to bankruptcy, a large amount of money, $1.4 million, flowed out of the Debtor to insiders of the company or their confederates, and then flowed between them and their corporations.

These "loans" were often made at times when BK Racing had monies in its accounts, such that there was no apparent reason for the Debtor to be borrowing from individuals, particularly from the owner's secretary. The timing is also suspicious in that the Transfers to these individuals always cleared BK Racing's account whereas other creditor's checks were routinely dishonored.[5] Finally, O'Haro the personal assistant was receiving and transferring sizeable sums of money via her bank accounts to Ron Devine's other businesses.

Thus, the Trustee reasonably believes the transfers were not loan repayments, but instead asset transfers to third parties, designed to shelter BK Racing's assets from its creditors. One of Smith's goals in discovery in the Related Cases was to gather information to determine whether the Transfers were, in fact, loans. However, the repeated failures of O'Haro to make discovery have made that inquiry impossible.

---

[4] Similar contentions are made by the Defendants in the Related Cases.
[5] Even for a company on the brink of bankruptcy, BK Racing had an inordinate number of NSF check charges. Despite this, the transfers to the Related Case Defendants always seemed to clear.

**DISCUSSION**

**A. Defendant's failure to comply with the requirements in the May 10 Order**

As noted, during the First Deposition, O'Haro repeatedly invoked the Fifth Amendment privilege against self-incrimination and declined to answer Smith's questions. In the May 10 Order, we did not criticize or sanction O'Haro for her invocation of the Fifth Amendment during her First Deposition. At the time of the First Deposition, a criminal investigation was underway and thus "O'Haro had reasonable cause to apprehend a real and substantial danger of self-incrimination if she answered Smith's questions." [Doc. 59 at 32]. Nor did we draw an adverse inference from her invocation of the privilege. Because O'Haro had been involved in BK Racing's activities, her caution was understandable.

However, by the time the Plaintiff's Report was heard, O'Haro had been released from her subpoena and was, by her own statement, available to testify.[6] In the May 10 Order, O'Haro was ordered to sit for a second deposition. Given her repeated assertions that loans were made but no loan related documents existed; her nonspecific defense that was barely more than narrative; and her repeated failures to make written discovery, the Second Deposition was critical. It was necessary so that Smith might ascertain what O'Haro knew about these matters. Highlighting the Second Deposition's importance, O'Haro was warned that her failure to answer questions at this deposition could have serious ramifications.

a. Second Deposition

Any hopes that the Second Deposition would provide illumination about the transactions between O'Haro, BK Racing, and the other Ron Devine entities was quickly dispelled.

---

[6] O'Haro's expressed willingness to testify at a second deposition was a key argument against the imposition of the default sanction then being sought by Smith.

9

O'Haro sat for the Second Deposition on September 28, 2022. For reasons of cost and convenience,[7] the Second Deposition was conducted virtually, via Zoom. Incongruously, O'Haro chose to sit for the Second Deposition at Ron Devine's office, even though she was no longer employed by Devine and his office is located approximately 1.5 hours away from her residence.

Throughout the deposition, O'Haro failed to answer even the most basic of questions.[8] She responded "I don't know" more than 100 times. [Doc. 81 at 3]. Although her Answer and prior discovery responses are adamant that the Transfers were loan repayments, O'Haro professed to know almost nothing about these transactions or about her affirmative defenses.

Making matters worse, a review of the deposition video confirms that someone was in the room with O'Haro during the deposition.[9] Based on the fact the deposition took place Ron Devine's office and a male voice is heard in the background, it is likely that Ron Devine was the person in the room.

It also appears that O'Haro spoke to someone during a break in the deposition and received coaching as to her testimony. This became evident when the only specific answer O'Haro was able to render about any of these matters occurred immediately after O'Haro asked for a break, exited the room, and returned.

Before the break, when asked about Springfield Land Development, LLC, O'Haro said it sounded familiar, but she was not able to provide any details. This answer is in spite of the fact that O'Haro previously maintained that over a period of years she loaned Springfield a total of

---

[7] O'Haro resides in Maryland; Smith and both sets of attorneys live in North Carolina.
[8] O'Haro stated she could not remember why she was previously deposed in this matter and basic facts such as her salary when she worked for Devine in 2018 and 2019.
[9] O'Haro denied this when asked, however the video of the deposition (which was shown multiple times throughout the course of the hearings) does capture a male voice in the room with Ms. O'Haro.

$560,000, held a second deed of trust against its sole property, and has attempted to enforce that deed of trust.

At that point in the deposition, O'Haro said she was choking and required a water break. After returning from a seven-minute break, O'Haro recalled—with clarity—key facts about the Springfield Land Development,[10] including, (1) she had a loan on Springfield Land Development, LLC, (2) she later sold that loan for about $300,000, and (3) John Petrelli was her lawyer in the transaction.[11] When asked by Smith's attorney if she had spoken with anyone in the hallway during the break, O'Haro claimed that she had not.[12] The circumstances suggest, and this Court finds, the contrary. Someone fed O'Haro these three answers. Presumably that person was the same person who had been in the room with O'Haro during the deposition, likely Ron Devine.

Despite the emphasis of the May 10 Order as to the importance of this second deposition, O'Haro was just as uninformative during her Second Deposition as she had been during the First Deposition. O'Haro's professed inability to remember any details about these matters other than the three coached facts offered after the break, makes it impossible to discern the details critical to determining the status of the Transfers and to evaluate her contention that these were simply loan repayments and not retransfers of BK Racing's money, as Smith suspects.

While O'Haro claims to have issues with her memory, this is a new assertion not made prior to the Second Deposition. Nor is it supported by any evidence; O'Haro has not provided any explanation for, or third-party confirmation, to a memory failure on her part. There was ample time between the second deposition (September 28, 2022) and the hearing/trial (June-August 2023)

---

[10] The Springfield matter is material to Smith's contention that the Transfers to O'Haro were not loans repayments, but rather, Ron Devine's use of alter egos and strawmen to shield his and BK Racing's assets.

[11] This was contrary to her earlier statement that John Petrelli had never represented her.

[12] Devine later admitted that he spoke with O'Haro several times <u>during</u> the deposition, although he claims this was only to introduce O'Haro to a visitor in his office, to see if she wanted him to pick up lunch for her, and to help her set up the Zoom meeting.

to obtain a medical evaluation and diagnosis if this was the case. Given the obfuscation by the defendants in this proceeding, in the Related Cases, and by the Debtor's management in the base bankruptcy case, we are not able to simply accept O'Haro's bare assertion.

It could be that O'Haro has permitted Ron Devine to manage her affairs, including the prepetition transfers and even the defense of her action—that she is his strawman.[13] Or, O'Haro may be an accomplice, a coconspirator who helped to secret his and BK Racing's assets. Either alternative appears more likely than her present contention that, as Ron Devine's personal assistant, O'Haro was a major lender to him and his companies, including BK Racing. Apart from the financial improbability, the wholesale failure of O'Haro to provide any details about these matters at the Second Deposition, followed by a water break and crystal clarity about three facts, and then a return to a total lack of factual recall[14] makes her story is too unlikely to believe. We must view O'Haro's failure to answer questions at the second deposition as further, willful acts of noncompliance, and at the least providing false, suborned testimony.

  b. Hearing/Trial

Even the hearing/trial of these matters suggests an unwillingness by O'Haro to provide information about her relationship with BK Racing, et.al. This was O'Haro's last opportunity to make her defense, to explain how she came to have so much money of BK Racing and the other Ron Devine companies flowing through her bank accounts. While O'Haro was present at the trial, she chose not to testify. O'Haro's counsel simply penned this as O'Haro not being comfortable testifying.

---

[13] This Court has previously warned the Related Party Defendants' counsel that the interests of their clients may not be congruent with those of the Devine's and the Ron Devine entities.

[14] It does not help that Ron Devine's parole testimony about the Transfers was also nonspecific and more akin to a narrative than an explanation. He provided almost no particulars about the Transfers that could not be deduced from the checks and bank statements.

Again, BK Racing and O'Haro maintain the transfers were simply the repayment of short-term loans to the Debtor. While that is a possibility, the multiple transfers between O'Haro and the Ron Devine companies and the improbability of a person of modest means loaning such large sums to her employer—unsecured, undocumented, and at no interest—makes it unlikely. Had O'Haro testified with detail at the Second Deposition or even at the hearing, she might have explained these factual anomalies. That she chose not to speaks volumes.

By failing to make discovery and then by not testifying at the latest hearing, O'Haro created the scenario against which this Court has repeatedly warned the Related Case Defendants—a trial in which the participants offer self-serving parole testimony about what happened. And where, due to a lack of meaningful discovery responses and deposition testimony, Smith, an after-the-fact bankruptcy trustee, is unable to contest their assertions. And that is exactly what happened.

Ron Devine testified at O'Haro's hearing/trial with generality and consistency as to O'Haro's pleadings,[15] but with little detail and no supporting extrinsic evidence, apart from the checks. Devine said O'Haro had loaned BK Racing money to keep the racing team going. He said O'Haro never charged BK Racing an interest rate, and he always accepted the loans on behalf of BK Racing with the intent to repay her as soon as he could. Devine also claimed O'Haro had memory issues. Ultimately, he failed to address key questions about the Transfers.

As detailed in the default ruling in <u>Smith v. Devine, et. al.</u>, Adv. No. 20-3014, Doc. No. 81, Ron Devine has a poor track record in this case, and elsewhere. His own failures to make discovery have caused him to previously be held in contempt and then to be defaulted in his own proceeding. <u>Id</u>. He is not a credible witness and Smith should not be "stuck" with Devine's parole account.

---

[15] Including O'Haro's lack of knowledge about her defenses at the Second Deposition, Devine's testimony suggests that Ron Devine himself was managing her defense of this action.

13

Thus, between O'Haro failing to provide answers to questions brought up by Smith throughout the Second Deposition; by having an undisclosed, "off camera" person in the deposition room; and by offering selective, coached testimony, O'Haro has once again willfully failed to make discovery and failed to comply with the May 10 Order.

### B. Default Judgment

As to that May 10 Order, we were not then inclined to enter a default judgment against O'Haro. In the Fourth Circuit, default judgment is warranted in cases involving bad faith and callous disregard for the court and rules. Flores v. Ehticon, Inc., 563 F. App'x 266, 274 (4th Cir. 2014); Mut. Fed. Sav. & Loan Ass'n., 872 F.2d at 92 (4th Cir. 1989). At the time of the May 10 Order, three of the four requirements for default judgment had been established. There was bad faith, Smith and the creditors of BK Racing had been prejudiced, and the need for deterrence weighed in favor of a default judgment. [Doc. 59]. The only missing element was the imposition of lesser sanctions, a requirement that before the entry of a default judgment, there be "a last-resort sanction following the [party's] continued disregard of prior warnings." Anderson v. Foundation for Advancement, 155 F.3d 500, 505 (4th Cir. 1998). Since the May 10 Order was entered, and in spite of the imposed sanctions, O'Haro has disregarded the prior discovery orders. If anything, she has become even more uncooperative with Smith's discovery inquiries. As a result, Smith and the creditors cannot receive a fair trial.

The integrity of the judicial process demands more than what has been provided by the Defendant in this adversary proceeding—which amounts to a few checks and an unverifiable story. This case has strained both Smith's[16] and the Court's resources in the effort to discover the truth of these matters. Also, this adversary proceeding is not a "one off" matter. Rather, it is intrinsically

---

[16] As Smith's costs and fees are paid out of limited bankruptcy estate funds, these are injuries to creditors.

14

linked with the Related Cases. Each proceeding involves Ron Devine, his companies and confederates, the same lawyers, similarly protracted discovery disputes, and a concerted effort to ensure that it is Devine or the Defendant who provides the only explanation of events, a nonspecific narrative. Smith is left unable to discern key facts and unable to receive a fair trial.

O'Haro's lack of cooperation has been pervasive. While Anderson only allows default judgment to be imposed as a last resort, the Anderson standard for default judgment has been met here. Default judgment is the only remaining remedy to address O'Haro's continued discovery misconduct and failure to abide by discovery orders.

## CONCLUSION

From the outset, O'Haro has failed to comply with discovery and has failed to provide adequate information to allow for a fair trial. O'Haro's failure to comply with discovery prior to the entry of the Order is laid out in detail. [Doc. 59]. The Order lists requirements for O'Haro that would assist Smith in gathering the requisite discovery information regarding the Transfers. Because of O'Haro's consistent invocation of the Fifth Amendment during the first deposition—which we did not sanction her for—the Order required O'Haro to "sit for a second deposition, once written discovery has been concluded." [Doc. 59 at 32]. In analyzing the appropriate measures to address O'Haro's discovery failures, we found that while a default judgment would be premature at the time, "three of the four factors" supporting a default judgment existed. [Doc. 59 at 33–34]. This meant O'Haro's behavior prior to the entry of the Order met the elements of bad faith, prejudice to the creditors, and the need for deterrence of the type of noncompliance at issue. The only remaining element, the effectiveness of less drastic sanctions, had not been met at the time the Order was entered. [Doc. 59 at 34]. The Order served as an attempt to impose less drastic sanctions on O'Haro. It is now clear, however, that the less drastic sanctions were not effective.

15

With all four elements of the four-part default judgment test now met, we believe default judgment is now appropriate, and necessary.

**BASED ON THE FOREGOING, IT IS ORDERED:**

1. Smith's Renewed Motion for Sanctions to Compel as reasserted, is **GRANTED**;

2. The Defendant is taxed with Smith's costs and attorneys' fees incurred in pursuing the Renewed Motion for Sanctions to Compel and this renewed request for relief, pursuant to Rule 37(b)(2)(C). To that end, Smith shall submit, within twenty-one (21) days, an affidavit and itemization of his costs and attorneys' fees relating to the Renewed Motion for Sanctions to Compel. Defendant shall file any objections thereto within fourteen (14) days thereafter;

3. Defendant's answer and defenses are **STRICKEN**, and **DEFAULT JUDGMENT** will be entered against as to Claims 1-5 and 7 of the Complaint, save for the determination of any damages which are not in a sum certain or can be made certain by computation within the meaning of the Federal Rules of Civil Procedure 55(b)(1). No Judgment will be entered as to Smith's Sixth Claim (11 U.S.C. § 547) which was pled in the alternative and, as under the circumstances, is it unclear whether any debt existed. Claim 8 (Turnover) is **DISMISSED**, as there appears to be no identifiable property at issue and instead a monetary judgment is being entered;

4. After serving a proposed Default Judgment on Defendant's counsel and affording them at least seven (7) days to comment, Smith may tender the same to the Court for its consideration;

5. The Court will maintain jurisdiction over the interpretation and implementation of this order. This will include making such other, further, additional, or different

findings, orders, or judgments, as may be necessary to give full effect to the

foregoing Order and the prospective Default Judgment.

**SO ORDERED.**

| | |
|---|---|
| **This Order has been signed electronically.** <br> **The Judge's signature and Court's seal** <br> **appear at the top of the Order.** | **United States Bankruptcy Court** |